**IN THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF UTAH**

**CENTRAL DIVISION**

| | |
|---|---|
| **UTAH LIGHTHOUSE MINISTRY, INC., a Utah corporation,** | |
| **Plaintiff,** | **MEMORANDUM DECISION AND ORDER** |
| **vs.** | |
| **DISCOVERY COMPUTING, INC., an Arizona Corporation and ALLEN L. WYATT, an individual, THE FOUNDATION FOR APOLOGETIC INFORMATION & RESEARCH (FAIR), a New York Corporation and SCOTT GORDON, an individual, and DOES 1-10, inclusive.** | **Case No.  2:05CV000380DAK** |
| **Defendants.** | |

This matter is before the court on several motions: Defendants Allen L. Wyatt ("Wyatt")

and Discovery Computing, Inc.'s ("DCI") (collectively the "DCI Defendants") Rule 56 Motion

for Summary Judgment of No Trademark Infringement; the DCI Defendant's Motion to Strike

Plaintiff's Motion for Summary Judgment of the Issue of Domain Name Cyberpiracy;

Defendants The Foundation for Apologetic Information & Research ("FAIR") and Scott

Gordon's ("Gordon") (collectively the "FAIR Defendants") Motion for Summary Judgment and

Joinder in DCI Defendants' Motion for Summary Judgment; the FAIR Defendants' Joinder in the

DCI Defendants' Motion to Strike Plaintiff's Second Motion for Summary Judgment; the FAIR

Defendants' Objection to Plaintiff's Motion to Have Court Take Evidence at Hearing on Motions

for Summary Judgment; Plaintiff Utah Lighthouse Ministry, Inc.'s ("UTLM" or Plaintiff) Motion

for Summary Judgment on the Issues of Trademark Infringement, Unfair Competition and Joint

Tortfeasor Liability; and Plaintiff's Motion for Summary Judgment on the Issue of Cyberpiracy.

The court did not hear argument on the Motions to Strike, but took them under advisement.  At

the hearing, Paul C. Oestreich represented Plaintiff.  Ronald L. Dunn represented the FAIR

Defendants and Lance Starr represented the DCI Defendants.  Before hearing argument, the court

ruled on the FAIR Defendants' Objection to Plaintiff's Motion to Have Court Take Evidence at

Hearing on Motions for Summary Judgment and refused to allow the admittance of further

evidence.  Although the court did not hear argument on the Motions to Strike, both of

Defendants' counsel stipulated to allow Plaintiffs' Motion for Summary Judgment on the Issue of

Cyberpiracy to be allowed to be received as a response to Defendants' Motion for Summary

Judgment to which the court ruled that "it comes in."  Before the hearing, the court carefully

considered the memoranda and other materials submitted by the parties.  Since taking the

motions under advisement, the court has further considered the law and facts relating to the

motions.  Now being fully advised, the court renders the following Memorandum Decision and

Order related to the motions before the court.

## BACKGROUND

        This matter arises out of the comparison of two similar Internet websites, and whether the

similarities are sufficient to support allegations of unfair competition, trademark infringement, dilution, trade dress and cybersquatting.

UTLM, founded by Jerald and Sandra Tanner, provides information critically analyzing the history and doctrines associated with the Church of Jesus Christ of Latter-day Saints ("LDS") through its books, newsletters and its Internet website.  UTLM offers materials for sale to the general public through its brick and mortar bookstore, as well as an online bookstore.  The UTLM website can be found under the registered the domain name utlm.org.

Wyatt, a professional website designer, is the webmaster and Vice President of FAIR, a volunteer organization that responds to criticisms of the LDS Church.  In November, 2003, Wyatt created a website which attempted to parody the UTLM website (the "Wyatt Website").  Wyatt registered the following ten domain names, each of which directed visitors to the Wyatt Website: utahlighthouse.com, sandratanner.com, geraldtanner.com, geraldtanner.org, utahlighthouse.org, utahlighthouseministry.org, sandratanner.org, jeraldtanner.com, utahlighthouseministry.com, and jeraldtanner.org.[1]

***The Wyatt Website v. The UTLM Website***

**The Wyatt Website**

The Wyatt Website has a centered heading box containing the words: "Utah Lighthouse Ministry, Shadow or Reality?" in blue text.  The word "Shadow" is in green, Halloween-type font.  The phrase "Shadow or Reality?" appears to reference the title of Plaintiff's largest selling book.  Below the heading box is the phrase: "Welcome to an official Website about the Utah

---

[1]In 2004, Wyatt was gratuitously registered the domain names utahlighthouse.info, jeraldtanner.info and sandratanner.info.

3

Lighthouse Ministry, which was founded by Jerald and Sandra Tanner.  The purpose of this site is to document problems with the claims made by Jerald and Sandra Tanner under the guise of Christianity."  Below the header box to the right is a large photograph of a lighthouse with black and white barbershop stripes.  On the three white stripes, in red type are the words "destroy," "mislead," and "deceive."  Below the header box to the left is an identical, but faint, image of the same lighthouse with two hyperlinks printed across the photograph: "Click this Lighthouse to see Reliable Information About the LDS Church" and "Click the Lighthouse's base for the Official LDS Site."  Down the center of the webpage, below the header box and between the images of the lighthouses, three scriptural references, followed by two hyperlinks: "Articles about the Tanners" and "Books by the Tanners."  The "Books" link gives a selection of hyperlinks to additional articles, including links to the Brigham Young University's Foundation for Ancient Research and Mormon Studies ("FARMS") and to the official LDS Church website, and an article posted on the FAIR website.[2]  At the bottom of the page, is a centered box containing the following text:

> "For more than three decades, Jerald and Sandra Tanner have devoted their lives to exposing and trying to destroy Mormonism.  They have succeeded in upsetting Mormons of various persuasions, largely because of their abrasive writing style, which is most nearly reminiscent of FBI undercover agents reporting back to J. Edgar Hoover on the terrible continuing threat of the worldwide communist (read: Mormon) conspiracy." [Lawrence Foster, "Apostate Believers: Jerald and Sandra Tanner's Encounter with Mormon History," *Differing Visions: Dissenters in Mormon History,* edited by Roger D. Launius and Linda Thatcher (Urbana, Illinois: University of Illinois Press, 1994), 343.]

---

[2]Like UTLM, FAIR operates an informational website and an online bookstore. Visitors to the FAIR website homepage are offered a link to the FAIR LDS bookstore.  Some of the books offered for sale at the FAIR online bookstore appear to overlap with some of the books offered for sale at the UTLM online bookstore.

4

Wyatt provided access to the Wyatt Website to FAIR's members.  Gordon, FAIR's president, upon visiting the Wyatt Website, discovered that the hyperlink from the Wyatt Website to FAIR was wrong and asked that it be corrected.

**The UTLM Website**

The UTLM Website's heading box contains the words: "Utah Lighthouse Ministry, PO Box 1884 Salt Lake City, UT 84110."  Centered below the box is the phrase: "Welcome to the Official Website of Utah Lighthouse Ministry, founded by Jerald and Sandra Tanner.  The purpose of this site is to document problems with the claims of Mormonism and compare LDS doctrines with Christianity."  Below the header box to the right is a large drawing of a lighthouse and clouds, with black and white barbershop stripes.  Below the header box to the left is a large, faint image of the same lighthouse with thirteen hyperlinks printed across the drawing: "About Us," "FAQs," "What's New," "Topical Index," "Testimony," "Newsletters," "Online Resources," "Online Books," "Booklist," "Order/Contact," "Email," "Special Thanks," "Other Websites."  Down the center of the webpage, below the header box, there are three scriptural references.  At the top of the next webpage there is a centered box containing the following text:

> "Come on! ye prosecutors! ye false swearers!  All hell, boil over! Ye burning mountains, roll down your lava! for I will come out on top at last.  I have more to boast of than ever any man had.  I am the only man that has ever been able to keep a whole church together since the days of Adam.  A large majority of the whole have stood by me.  Neither Paul, John, Peter, nor Jesus ever did it.  I boast that no man ever did such a work as I.  The followers of Jesus ran away from him, but the Latter-day Saints never ran away from me yet . . . When they can get rid of me, the devil will also go." *(History of the Church*, Vol. 6, p. 408, 409) [Whole sermon click here.]
>
> - Joseph Smith: founder, prophet, seer, and revelator of The Church of Jesus Christ of Latter-day Saints.

At the bottom of the second webpage, the same thirteen hyperlinks from the first page are listed, including descriptions of each hyperlink's function and content.

**UTLM's Marks**

Plaintiff obtained federal trademark registration on July 25, 2006 for UTAH LIGHTHOUSE® MINISTRIES.  Plaintiff has designated  SANDRA TANNER™, JERALD TANNER™ as marks but has not applied for federal trademark registration for either of these marks.

**Potential Confusion Between the Websites**

Between January 2004 and March 2005, UTLM received seven emails from visitors to the Wyatt Website, each recognizing that it was not UTLM's website.  As a result of these emails, UTLM brought claims against Wyatt, DCI, Gordon and FAIR for federal and state trademark infringement, copyright infringement, trade dress, unfair competition and cybersquatting.

**STANDARD OF REVIEW**

Pursuant to Rule 56(c) of the Federal Rules of Civil Procedure, the court may grant summary judgment where "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law."  Fed. R. Civ. P 56(c) (2005); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248-250 (1986); *Concrete Works, Inc. v. City & County of Denver*, 36 F.3d 1513, 1517 (10th Cir. 1994).  The nonmoving party may not rest solely on the allegations in the pleadings, but must instead designate "specific facts showing

that there is a genuine issue for trial." *Celotex*, 477 U.S. at 324; *see* Fed. R. Civ. P. 56(e) (2005).

## DISCUSSION

This is a trademark infringement, unfair competition, dilution, trade dress and

cybersquatting suit under the Lanham Act, §43(A)(1), 15 U.S.C. § 1125.[3]

## I. Trademark Infringement, Unfair Competition and Dilution

Plaintiff alleges that Defendants[4] are liable for trademark infringement under the Lanham

Act because Defendants used Plaintiff's marks, without Plaintiff's consent, as the domain names

for the Wyatt Website. To succeed on a trademark infringement claim under the Lanham Act, a

plaintiff-trademark holder must show that, without plaintiff's consent, the defendant used

plaintiff's mark "in connection with the sale, offering for sale, distribution, or advertising of any

---

[3]Section 1125(a)(1) of the Lanham Act provides:
(a)(1) Any person who, on or in connection with any goods or services, or any container for goods, uses in commerce any word, term, name, symbol, or device, or any combination thereof, or any false designation of origin, false or misleading description of fact, or false or misleading representation of fact, which - -

    (A) is likely to cause confusion, or to cause mistake, or to deceive as to the affiliation, connection, or association of such person with another person, or as to the origin, sponsorship, or approval of his or her goods, services, or commercial activities by another person, or

    (B) in commercial advertising or promotion, misrepresents the nature, characteristics, qualities, or geographic origin of his or her or another person's goods, services, or commercial activities,

shall be liable in a civil action by any person who believes that he or she is likely to be damaged by such act. 15 U.S.C. § 1125(a)(1).

[4]The court refers to the DCI Defendants and the FAIR Defendants collectively as "Defendants" for simplicity in preparing this Order, unless referred to independently.

goods or services."[5]  15 U.S.C. §1125(a)(1); *see Donchez v. Coors Brewing Co.*, 392 F.3d 1211, 1216 (10th Cir. 2004); *see also OBH, Inc. v. Spotlight Magazine, Inc.*, 86 F.Supp.2d 176, 185 (W.D.N.Y. 2000) (quoting *Cadbury Beverages, Inc. v. Cott Corp.,* 73 F.3d 474, 477 (2d Cir. 1996)).  Similarly, "[t]he elements of common law trademark [are] . . . a plaintiff must establish a protectable interest in its mark, the defendant's use of that mark in commerce, and the likelihood of consumer confusion." *Donchez*, 392 F.3d at 1219;  *King of the Mountain Sports v. Chrysler Corp.*, 185 F.3d 1084, 1089 (10th Cir. 1999) (citing 15 U.S.C. §§ 114(1), 1125(a)) ("Likelihood of confusion forms the gravamen for a trademark infringement action.").

Similarly, to prevail on an unfair competition claim under the Lanham Act §43(a), a plaintiff must establish the same two factors as a trademark infringement claim under Lanham Act.  *See Packman v. Chicago Tribune Co.*, 267 F.3d 628, 638 (7th Cir. 2001); *see* 15 U.S.C. § 1125(a)(1).

In order to determine the validity of Plaintiff's infringement and unfair competition claims, the court must consider Plaintiff's demonstration of Defendant's "commercial use," whether Plaintiff had a protectable mark, and the likelihood of confusion.

### A.      *"Commercial Use"*

The first question before the court is whether Wyatt's registration and use of the ten domain names directing Internet traffic to the Wyatt Website were a "noncommercial" fair use under federal or state trademark law.  *See* 15 U.S.C. § 1125(a)(1)(B);  *see also* U.C.A. § 13-5-a-

---

[5]Although Plaintiff's Complaint only brought claims under 15 U.S.C. §1125(a)(1), to fully analyze Plaintiff's trademark infringement claim, the court references Section 1114 of the Lanham Act.

101 *et seq.*  The Tenth Circuit has not yet addressed this issue, but other courts have concluded that for a plaintiff to prevail on its claims, "commercial use" is required.  *See Taubman Co. v. Webfeats*, 319 F.3d 770, 774 (6th Cir. 2003);  *Bosley Medical Institute, Inc.*, 403 F.3d 672, 675 (9th Cir. 2005).  The "commercial use" requirement is designed to protect both the trademark holder and the First Amendment rights of any citizen to comment and critique the mark holder.  *See Bosley Medical,* 403 F.3d at 676.

Plaintiff claims that Defendants' use of Plaintiff's marks constitute a "commercial use" in three ways.  *See People for the Ethical Treatment of Animals v. Doughney* ("*PETA*"), 263 F.3d 359, 366 (4th Cir. 2001) (where individual made false representations to be able to register 50-60 domain names, including PETA.org, despite being a parody site); *see* 15 U.S.C. §1114.  First, the Wyatt Website contained a hyperlink to FAIR's website, which in turn linked to FAIR's online bookstore.  *See OBH,* 86 F.Supp.2d at 185-86.  Second, Plaintiff claims the broad scope of the Internet itself makes Defendants' use of Plaintiffs' mark, as a domain name, a "use in commerce" for purposes of the Lanham Act.  *Id.* at 186; *Planned Parenthood Fed'n of America, Inc. v. Bucci*, 1997 WL 133313, at *3 (S.D.N.Y. 1997) *aff'd* 152 F.3d 920 (2d Cir. 1998), *cert. denied,* 525 U.S. 834 (1998); *Intermatic Inc. v. Toeppen*, 947 F.Supp. 1227, 1239-40 (N.D.Ill. 1996).  Finally, Defendants' use of Plaintiff's marks affects Plaintiff's ability of offer its services in commerce.  *See OBH*, 86 F.Supp.2d at 186; *Planned Parenthood*, 1997 WL 133313 at *3.  The court considers each of Plaintiff's assertions in turn.

## 1.      Hyperlinks

The use of a plaintiff's trademark as the domain name for a website satisfies the

"commercial use" requirement if the website contains a hyperlink that connects users to another of a defendant's websites if it operates for "commercial purposes." *See OBH*, 86 F.Supp.2d at 185-86. However, where a "website contain[s] no commercial links, but rather contain[s] links to a [website], which in turn contain[s] advertising" or has a commercial purpose, this does not satisfy the "commercial use requirement of the statute." *See Bosley Medical*, 403 F.3d at 678; *see also TMI, Inc. v. Maxwell*, 368 F.3d 433, 435, 438 (5th Cir. 2004) (holding that the commercial use requirement is not satisfied where defendant's site itself had no outside links); *see also Taubman Co. v. Webfeats*, 319 F.3d 770, 775 (6th Cir. 2003) ("As long as [defendant] has no commercial links on . . . his websites . . .we find no use 'in connection with the advertising' of goods and services to enjoin,' and the Lanham Act cannot be properly invoked.").

In *Bosley Medical Institute, Inc. v. Kremer*, a dissatisfied client purchased a domain name and posted information critical of Bosley on a website. *See* 403 F.3d at 672. Bosley sued for Lanham Act violations. The court reviewed whether Kremer's use of Bosley's marks in his domain name satisfied the "commercial use" requirement under the Lanham Act found that "[a]t no time did Kremer's BosleyMedical.com site offer for sale any product or service or contain paid advertisements from any other commercial entity" and found no Lanham Act violation. *Id.* at 678.

Plaintiff claims Defendant's "commercial use" is clearly established by reliance on *PETA*. In *PETA*, the defendant's website "provide[d direct] links to more than 30 commercial operations offering goods and services." *PETA*, 263 F.3d at 366. The Wyatt Website did not have any direct links to any commercial websites and did not "prevent users from obtaining or using

[Plaintiff's] goods or services." *Id.* at 362-63.  The Wyatt Website contained a hyperlink connecting users to FAIR's website, which in turn had a hyperlink to the FAIR online bookstore.[6] The Wyatt Website provided no goods or services, earned no revenue, and had no direct links to any commercial sites.  The links on the Wyatt Website are insufficient to satisfy the "commercial use" requirement under the Lanham Act.

### 2.    International Nature of Internet

Plaintiff claims that "the national, and even international, nature of the Internet itself makes defendants' use of plaintiffs' trademark as a domain name a 'use in commerce' for purposes of the Lanham Act."  *Id.* at 186; *Planned Parenthood*, 1997 WL 133313 at *3 ("The nature of the Internet indicates that establishing a typical home page on the Internet, for access to all users, would satisfy the Lanham Act's "in commerce" requirement.").  Relatively few courts have adopted this view.

### 3.    Hindering Plaintiff's Ability to Offer Services in Commerce

Finally, Plaintiff claims that Defendants' use of Plaintiff's marks affected Plaintiff's ability of offer its services in commerce.  *See OBH*, 86 F.Supp.2d at 186; *Planned Parenthood*, 1997 WL 133313 at *3 .  In support of its assertion that Defendants' use is "commercial", Plaintiff relies on *Planned Parenthood Federation of America v. Bucci*, where the offending use of the disputed domain name was "commercial" because the defendant's efforts were part of a broader effort to solicit contributions for the anti-abortion movement and designed to hurt the plaintiff commercially.  *See Planned Parenthood*, 1997 WL 133313 at *5; *see also Jews for*

---

[6]Plaintiff claims that it is undisputed that the FAIR homepage has a link to a webpage which sells books identical to those sold by Plaintiff.

*Jesus v. Brodsky*, 993 F.Supp. 282 (D.N.J.), aff'd, 159 F.3d 1351 (3d Cir. 1998) (finding use of plaintiff's mark in domain name was "commercial use" because site was "a conduit" to another of defendant's webpages, which conducted fund raising through the sale of merchandise). There has been no showing here that Plaintiff has been harmed commercially or that Defendants' intended to do Plaintiff any harm in the future..

Plaintiff has not alleged that Defendants have used their marks in connection with goods and services in any literal sense. *See Ford Motor Co. v. 2600 Enterprises*, 177 F.Supp.2d 661, at 665 (E.D. Mich. 2001) (quoting *Planned Parenthood*, 1997 WL 133313 at *4, quoted in *Jews for Jesus*, 993 F.Supp. at 309). In *Ford Motor Co. v. 2600 Enterprises*, the court distinguished *Planned Parenthood* and *Jews for Jesus*'s holdings finding that using the Ford mark in the programming code did not inhibit Internet users from reaching websites most likely to be associated with the mark holder. *Id.* The court also found that the unauthorized use "in no way competes with the mark owner's offering of goods or services, [and] the 'in connection with goods or services' requirement is not satisfied simply because a prospective user of the Internet may face some difficulty in finding the home page he is seeking." *Id.* at 665. In this case, Plaintiff has not shown that Defendants' use of Plaintiff's marks actually hindered any prospective user's ability to find Plaintiff's webpage or caused any confusion once locating it.

### 4.     Parody or Critical Commentary as an Exception to Commercial Use

"[T]he noncommercial use of a trademark as the domain name of a website-the subject of which is consumer commentary about the products and services represented by the mark-does not constitute infringement under the Lanham Act." *Bosley Medical,* 403 F.3d at 674. "Courts

additionally have extended protection to unauthorized uses of trademarks for the expressive

purposes of comedy, parody, allusion, and so forth, even where the medium of expression is sold

for money." *See Mattel, Inc. v. MCA Records,* No. CV 97-6791 WMB, 1998 WL 422641, *14-

15 (C.D.Cal. 1998); *Charles Atlas, Ltd. v. DC Comics, Inc.,* 112 F. Supp.2d 330, 338-39

(S.D.N.Y. 2000); *Northland Ins. Cos. v. Blaylock*, 115 F.Supp.2d 1108, 1122-23 (D.Minn.

2000). Parody does not receive absolute protection from trademark law, but "a parody contained

in an obvious editorial context is less likely to confuse, and thus [is] more deserving of protection

than [trade dress and trademarks] displayed on a product." *Anheuser-Busch, Inc. v. Balducci

Publ'ns.,* 28 F.3d 769, 776 (8th Cir. 1994); *see also Faegre & Benson, LLP v. Purdy*, 367

F.Supp.2d 1238 (D.Minn. 2005) (applying a six-pronged analysis to determine the strength of the

mark and whether trade dress was deserving of protection).

Wyatt claims that the Wyatt Website "provided a nice parody of [Plaintiff's] website"

without a commercial use. Although some courts restrict consumer commentary on websites,

"[t]he *PETA* approach would place most critical, otherwise protected consumer commentary

under the restrictions of the Lanham Act. Other courts have also rejected this theory [*PETA's*] as

over-expansive." *Bosley Medical*, 403 F.3d at 679; *see also L.L. Bean, Inc. v. Drake Publishers,

Inc.,* 811 F.2d 26, 33 (1ˢᵗ Cir. 1987); *see also Ford Motor Co.*, 177 F.Supp.2d at 664. The court

believes the Wyatt Website was a noninfringing parody of Plaintiff's site.

## B.    *Whether Plaintiff's Marks Are Legally Protectable*

The second element of a trademark infringement or unfair competition claim is whether

or not Plaintiff 's marks are protectable. *See* 15 U.S.C. § 1125(a)(1). Under the Lanham Act, a

plaintiff must prove that "if the claimed trade dress includes any mark or marks registered on the principal register, the unregistered matter, taken as a whole, is famous separate and apart from any fame of such registered marks."  15 U.S.C. § 1125(c)(4)(B).  Plaintiff must also show that its marks are "widely recognized by the general consuming public of the United States." 15 U.S.C. § 1125(c)(2)(A)(1); *see* 15 U.S.C. § 1125(a)(1);  *Vornado Air Circulation Sys. v. Duracraft Corp.*, 58 F.3d 1498, 1502-03 (10th Cir. 1995).

The marks Plaintiff claims Defendants infringed were not registered trademarks at the time the Wyatt Website was created.[7]  However, Plaintiff claims that its marks have acquired secondary meaning under which liability may be imposed under the Lanham Act.  An unregistered mark's secondary meaning is a question of fact and "to acquire this secondary meaning, the descriptive words must have been used so long and so exclusive by one producer with reference to his goods and articles that, in the trade and to that branch of the purchasing public, the word or phrase (has) come to mean that the article is his product."  *Educational Dev. Corp. v. Economy Co.*, 562 F.2d 26, 29-30 (10th Cir. 1977).

Plaintiff has merely alleged that "Utah Lighthouse Ministry," "Sandra Tanner" and "Jerald Tanner" are well known marks in the limited submarket of those individuals familiar with criticisms of the LDS church.  This does not satisfy the statute's requirements.  The court does not find that Plaintiff's unregistered marks are sufficiently famous or have acquired a secondary meaning to the general consuming public of the United States.  Defendants' Motion

---

[7]"Utah Lighthouse Ministries" is now a registered trademark, but it was not registered until after the filing of this lawsuit.  "Sandra Tanner" and "Jerald Tanner" are not registered trademarks.

for Summary Judgment on Plaintiff's sixth claim for relief, trade dress infringement, is granted.

### 1.      Cybersquatting

Under the Lanham Act, civil liability attaches for a bad faith intent to profit from another's legally protectable marks.[8]  *See* 5 U.S.C. §§ 1125 (a)(1)(c) - (d)(1)(A), § 1129, (Anticybersquatting Consumer Protection Act ("ACPA")); *see also Harrods Limited v. Sixty Internet Domain Names*, 302 F.3d 214, 225 (4th Cir. 2002).

To prevail on a claim under the ACPA, the owner of a mark must show: 1) that the mark is distinctive or famous; 2) if the mark is distinctive, that the alleged cybersquatter's domain name is 'identical or confusingly similar' to the owner's mark; or if the mark is famous, that the alleged cybersquatter's domain name is 'identical or confusingly similar' to or dilutive of the mark; and (3) that the alleged cybersquatter used, registered, or trafficked in the domain name with a bad faith intent to profit from the sale of the domain name. 15 U.S.C. §1125(d)(1)(A).

Registration of a mark constitutes prima facie evidence of the validity of a mark and of the registrant's exclusive right to use the mark on goods and services specified in the registration.

---

[8]15 U.S.C. § 1125(d)(1)(A) provides:
A person shall be liable in a civil action by the owner of a mark, including a personal name which is protected as a mark under this section, if, without regard to the goods or services of the parties, that person
(i) has a bad faith intent to profit from that mark, including a personal name which is protected as a mark under this section; and
(ii) registers, traffics in, or uses a domain name that –
> (I) in the case of a mark that is distinctive at the time of registration of the domain name, is identical or confusingly similar to that mark;
> (II) in the case of a famous mark that is famous at the time of registration of the domain name, is identical or confusingly similar to our dilutive of that mark; or
> (III) is a trademark, work or name protected by reason of section 706 of Title 18 or section 220506 of Title 36.

*See OBH*, 86 F.Supp.2d at 186-87; *see also* 15 U.S.C. §§ 1057(b) and 1115(a).  However, none of the marks that Plaintiffs claim Defendants infringed were registered trademarks at the time Wyatt created the Wyatt Website or during the period of the Wyatt Website's life span. Therefore, this court must decide whether Defendants' registration and use of Plaintiff's unregistered marks as domain names linking to the Wyatt Website diluted Plaintiff's marks in violation of the Lanham Act and constituted "bad faith" under the ACPA.

The ACPA enumerates nine nonexclusive "bad faith factors" to determine whether or not bad faith intent may properly be inferred here.  *See* 15 U.S.C. § 1125(d)(1)(B)(i)-(ii).

The first "bad faith" factor is whether Defendants have trademark rights in any of the ten domain names at issue.  *Id.*  Plaintiff claims Defendants did not have intellectual property rights in any of the registered domain names, indicating a bad faith intent to register Plaintiff's marks and personal names. However, Plaintiff had not registered any of the marks at the time Wyatt registered the domain names.  The second factor considers whether the domain names at suit are not the legal names of any of the named defendants.  This weighs in favor of finding the Defendants had a bad faith intent to profit from registering the ten domain names.  *Id.*  Third, Defendants do not appear to have any prior use of the domain names in connection with the bona fide offering of any goods or services, weighing in favor of a finding of bad faith.

Under the fourth factor, Defendants have no bona fide commercial use of the mark in the Wyatt Website accessible under the ten domain names at suit. This factor is "intended to balance the interests of trademark owners with the interests of those who would make lawful noncommercial or fair uses of other's marks online such as in comparative advertising, comment

16

criticism, parody, news reporting, etc." H.R. Rep. No. 106-412, 1999 WL 970519, at *11.

Plaintiff claims that a "parody" is defined as a "simple form of entertainment conveyed by

juxtaposing the irreverent representation of the trademark with the idealized image created by the

mark's owner." *PETA*, at 366. A parody should convey "that it is the original, but also that it is

*not* the original and is instead a parody." *Id*. Plaintiff claims that Wyatt's Website failed as a

parody because it caused confusion and was indistinguishable from Plaintiff's website. *See*

*Lamparello v. Falwell*, 420 F.3d 309, 311 (4th Cir. 2005) (illustrating web site where it was

obvious to the ordinary observer that the website was not linked to the plaintiff due to

disclaimers). The court does not agree. Clearly visitors reading the Wyatt Website recognized

immediately that it did not belong to Plaintiff. The fourth factor weighs heavily for a finding of

"good faith" intent.

     The fifth factor requires a showing that Defendants intended to divert consumers from

Plaintiff's website to the Wyatt Website accessible under the domain names at suit, that harmed

the goodwill represented by Plaintiff's marks, for at least some commercial gain, with the intent

to tarnish or disparage Plaintiff's marks. Defendants must have also created a likelihood of

confusion as to the source, sponsorship, affiliation, or endorsement of the Wyatt Website.

Plaintiff has failed to show that the Wyatt Website has actually harmed its goodwill, that

Defendants had any commercial gain, or any actual intent to tarnish or disparage Plaintiff's

marks.

     The sixth factor, an intent to offer to transfer, sell or otherwise assign the domain names

at suit to the Plaintiff or any third party for financial gain does not appear to be applicable in this

case.  Plaintiff admits that Wyatt would have given the domain names to Plaintiff had they asked.

The sixth factor does not suggest an overt bad faith intent.  Similarly, the seventh factor does not

support a finding of bad faith because Defendants provided accurate contact information when

applying for the registration of the domain names at suit and have established a pattern of such

conduct.  The eighth factor, the registration of multiple domain names, leans toward a finding of

bad faith.  Defendants registered multiple domain names, some of which are identical or

confusingly similar to Plaintiff's marks, potentially dilutive of famous marks, without regard to

the goods or services of the parties. The ninth factor considers the extent to which the mark

incorporated into the person's domain name registration is or is not distinctive or famous within

the meaning of the Lanham Act.

       After consideration of the "bad faith" factors, the statute provides also includes a "safe

harbor" provision which explains that the "[b]ad faith intent described under subparagraph (A)

shall not be found in any case in which the court determines that the person believed and had

reasonable grounds to believe that the use of the domain name was a fair use or otherwise

lawful."  15 U.S.C. § 1125(d)(1)(B)(ii). Where a defendant does not exhibit a bad faith intent to

profit by selling a domain name, the "safe harbor" provision of the ACPA protects fair use.  *See*

*TMI*, 368 F.3d at 433; *see Virtual Works, Inc., v. Volkswagen of America, Inc.*, 238 F.3d 264, 264

(4th Cir. 2001); *see also Lucas Nursery & Landscaping, Inc. v. Grosse*, 359 F.3d 806, 809 (6th

Cir. 2004) (finding the key to the website was to inform about a negative experience rather than

to divert potential customers).  This "is not the typical cybersquatting situation where a person

registers a famous mark or name and then attempts to extort profits from the owner of the mark

by selling the domain name." *See e.g. Virtual Works, Inc.,* 238 F.3d at 264.  The court does not

believe that a finding of bad faith is appropriate in this case.  As such, Defendants may properly

find refuge in the ACPA's "safe harbor" provision protecting fair use.  Plaintiff's complaint

seeks injunctive relief restraining Defendants from using Plaintiff's marks.  Under the facts of

this case and Defendants' alleged  use of the marks, an injunction is not appropriate because

Defendants have already transferred the domain names to Plaintiff.  Accordingly, Defendants'

motion for summary judgment on Plaintiff's fifth claim for relief is granted.

### 2.    Dilution

In 1996, Congress amended §43 of the Lanham Act to provide a remedy for dilution of a

famous mark.  *See* 15 U.S.C. § 1125(c).  Under this section, the owner of a famous mark may

obtain injunctive relief against another person's commercial use in commerce of a mark or trade

name.  *See id*. § 1125(c)(1).  The court has already determined that Wyatt's use of the Plaintiff's

marks was not "commercial" for purposes of maintaining a trademark infringement claim.

Therefore, Plaintiff has not carried its burden to show that Wyatt's use was commercial under the

Lanham Act for a dilution claim either.  *See* 15 U.S.C. § 1125(c)(4);  *see Huthwaite, Inc. v.*

*Sunrise Assisted Living, Inc.*, 261 F.Supp.2d 502, 517 (E.D.Va. 2002) (holding that the

commercial use requirement of Section 1125(c) is "virtually synonymous with the 'in connection

with the sale, offering for sale, distribution, or advertising of goods and services' requirement" of

the Lanham Act).  Defendant's motion for summary judgment on Plaintiff's fourth claim for

relief is granted.

### C. That Causes Confusion

The third element of an infringement or unfair competition claim is whether or not the Wyatt Website confused visitors as to the origin of the information contained on the website. *See* 15 U.S.C. §§ 1125(a)(1), 1114.  The Lanham Act only prohibits use of trademarks, trade names, and trade dress that are likely to cause confusion about the source of a product or service. *See* 15 U.S.C. § 1125(a)(1).  The Tenth Circuit

> has identified six factors that serve as a guide for evaluating the likelihood of confusion:
> (a) the degree of similarity between the marks;
> (b) the intent of the alleged infringer in adopting its mark;
> (c) evidence of actual confusion;
> (d) the relation in use and the manner of marketing between the goods or services marketed by the competing parties;
> (e) the degree of care likely to be exercised by purchaser; and
> (f) the strength or weakness of the marks.

*See Team Tires Plus. Ltd. v. Tires Plus, Inc.*, 394 F.3d 831, 833 (10th Cir. 2005) (citing *King of the Mountain Sports*, 185 F.3d at 1089-90); *Big Dog Motorcycles, L.L.C. v. Big Dog Holdings, Inc.,* 402 F.Supp. 2d 1312, 1325 (D. Kan. 2005).

Under the first factor, at all times "the key inquiry is whether the consumer is likely to be deceived or confused by the similarity of the marks." *Team Tires, Ltd.,* 394 F.3d at 833*.*  When undergoing this analysis, the court is not to "engage in a 'side-by-side' comparison" but determine whether the mark is confusing when singly presented. *King of the Mountain Sports*, 185 F.3d at 1090.  The court is to "give the similarities of the marks more weight than the differences." *Id.*  Defendants claim that because the website was obviously a parody, the similarities were intentional, as were the obvious differences. *See Bosley Medical*, 403 F.3d at 679-80.  Despite the similarities, confusion is unlikely.

20

In analyzing the second factor, if there is proof that an infringer chose a mark with the intent to copy, this may, standing alone, justify an inference of likelihood of confusion. *See Beauty Co. v. Beautyco, Inc.*, 304 F.3d 964, 973 (10th Cir. 2002). However, if the evidence indicates that alleged infringer did not intend to derive benefit from an existing mark, this factor weighs against confusion. *See Heartsprings, Inc. v. Hartspring, Inc.*, 143 F.3d 550, 556 (10th Cir. 1998). Plaintiff claims that Wyatt intended to trade on Plaintiff's goodwill. *See Planned Parenthood*, 1997 WL 133313. Defendants claim the Wyatt Website was intended solely to as an alternate view, or to provide criticism, which is specifically protected by the Lanham Act. *See Bosley Medical*, 403 F.3d at 679-80.

There is no evidence of actual confusion in this case, thus the third factor weighs in Defendants' favor. *Compare Shields v. Zuccarini*, 254 F.3d 476 (3d Cir. 2001) (illustrating actual website confusion). The fourth factor weighs in Defendants' favor because the Wyatt Website did not compete with Plaintiff's website. The Wyatt Website did not offer goods or services, specifically, it did not have an online bookstore, Plaintiff's main argument for competition. The fifth factor weighs in Defendants' favor because, as explained above, the Wyatt Website did not offer any goods or products for consumers to purchase. Finally, the "stronger the mark, the greater the likelihood that encroachment upon the mark will cause confusion." *Beauty Co.*, 304 F.3d at 975; *King of the Mountain Sports*, 185 F.3d at 1093. The court does not find that there was actual or a likelihood of confusion.

Plaintiff has simply not demonstrated Defendants' "commercial use" under the Lanham Act. This failure to prove "commercial use" requires dismissal of each of Plaintiff's claims. *See*

*Taubman Co.*, 319 F.3d at 774;  *Bosley Medical*, 403 F.3d at 675.  As such, Defendants' Motions for Summary Judgment on Plaintiff's 1st, 2nd, 4th, 5th, and 6th claims are granted.

## II.  State Law Claims for Unfair Competition

Utah law governing unfair competition, infringement of a patent, trademark or trade name requires "intentional business acts or practices," similar to the requirements of the Lanham Act.[9] *See* U.C.A. § 13-5a-102 (4)(a) *et seq.*; *see* 15 U.S.C. § 1125(a)(1).  The court finds that Plaintiff did not sufficiently show that Defendants' met the "commercial use" requirement of the Lanham Act, similarly, Plaintiff's state law claims are deficient in making the same showing. Defendants' motion for summary judgment on Plaintiff's third claim for relief is granted.

## III.  FAIR Defendants' Liability

Plaintiff claims that because unfair competition and trademark infringement are tortious, the doctrine of joint tortfeasor liability applies to the FAIR Defendants.  *See David Berg & Co. v. Gatto International Trading Co.,* 884 F.2d 306, 311 (7th Cir. 1989).  Because the court has concluded that there is no liability for the DCI Defendants, there cannot be any joint tortfeasor liability flowing to the FAIR Defendants.  Plaintiff's claims for joint and several liability are dismissed in their entirety.

## CONCLUSION

Based upon the above reasoning, IT IS HEREBY ORDERED that Defendants' Motions for Summary Judgment are GRANTED and Plaintiff's Motions for Summary Judgment are DENIED.  Defendants' Motion to Strike is DENIED.  Plaintiff's case is dismissed with

---

[9] Plaintiff miscites the Utah Unfair Competition Act. U.C.A. § 13-5a-101 *et seq.,* which is properly found at U.C.A. § 13-5a-102 (4)(a) *et seq.*

prejudice, each party to bear its and own fees and costs.  The Clerk of Court is directed to enter

judgment in favor of Defendants.

DATED this 26th day of March, 2007.

BY THE COURT:

_____

DALE A. KIMBALL
United States District Judge